**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------

Petition of McCarthey Investments, LLC,
      Petitioner,

For an Order Pursuant to the Federal
Arbitration Act, 9 U.S.C. § 1, et. seq.
Confirming an Arbitration Award,

     •   against –

Abbas A. Shah, Linuxor Asset Management,
LLC, and Linuxor Capital Management, LLC,
      Respondents.

Index No. 07cv5617
Hon. Denise Cote

-------------------------------------------------------------

-------------------------------------------------------------

Petition of 2001 Jane F. McCarthey GRAT No. 5,
      Petitioner,

For an Order Pursuant to the Federal
Arbitration Act, 9 U.S.C. § 1, et. seq.
Confirming an Arbitration Award,

     •   against –

Abbas A. Shah, Linuxor Asset Management,
LLC, and Linuxor Capital Management, LLC,
      Respondents.

Index No. 07cv5618
Hon. Denise Cote

-------------------------------------------------------------

-------------------------------------------------------------

Petition of JFM Holdings L.P.,
      Petitioner,

For an Order Pursuant to the Federal
Arbitration Act, 9 U.S.C. § 1, et. seq.
Confirming an Arbitration Award,

     •   against –

Abbas A. Shah, Linuxor Asset Management,
LLC, and Linuxor Capital Management, LLC,
      Respondents.

Index No. 07cv5619
Hon. Denise Cote

-------------------------------------------------------------

## PETITIONERS' REPLY MEMORANDUM

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................ i

INTRODUCTION ........................................................................... 1

ARGUMENT.................................................................................. 2

I.   THIS COURT HAS SUBJECT MATTER JURISDICTION OVER
     EACH OF THE THREE SEPARATE PETITIONS TO CONFIRM
     ARBITRATION AWARDS UNDER 28 U.S.C. § 1332........................... 2

II.  RESPONDENTS FAILED TO MOVE TO VACATE, MODIFY OR
     CORRECT THE ARBITRATION AWARDS WITHIN THE THREE
     MONTH PERIOD SPECIFIED IN SECTION 9 OF THE FEDERAL
     ARBITRATION ACT, AND ARE THEREFORE PRECLUDED FROM
     RAISING ANY DEFENSES TO THE ARBITRATION AWARDS............. 7

III. RESPONDENTS HAVE FAILED TO ESTABLISH ANY BASIS UPON
     WHICH THE ARBITRATION AWARDS SHOULD NOT BE
     CONFIRMED............................................................................. 9

     A. RESPONDENTS' FALSE, IMMATERIAL AND UNSUBSTANTIATED
        ASSERTIONS ABOUT THE ARBITRATION PANEL MEMBERS
        FAIL TO MEET THE EVIDENT PARTIALITY STANDARD UPON
        WHICH AN ARBITRATION AWARD MAY BE CHALLENGED........ 9

     B. RESPONDENTS' ATTEMPT TO RELITIGATE THE FACTS BEFORE
        THIS COURT FAILS TO MEET THE "MANIFEST DISREGARD" OF
        THE LAW STANDARD UPON WHICH AN ARBITRATION
        AWARD MAY BE CHALLENGED................................................ 14

        1. THE EVIDENCE IN THE ARBITAL RECORD IS OVERWHELMING
           THAT RESPONDENTS ENGAGED IN EGREGIOUS AND
           PERSISTENT FRAUD......................................................... 15

           • Respondents fraudulently induced the McCarthey Investors to
             invest in the Linuxor Fund in March and May 2002 by making
             materially false and misleading representations about the Fund.... 16

           • In April 2002, after the McCartheys made an initial investment
             in the Fund of $1.5 million, Shah provided materially false and
             misleading performance results to McCarthey in order to induce
             the McCarthey Investors to make an additional $10 million
             investment in the Fund..................................................17

- **From March 2002 through July 2004, Respondents ran the Linuxor Fund in material contravention of the representations of the Offering Memorandum, causing over $6 million in damages to the Petitioners** ............................................................... 18

- **Shah Repeatedly and Materially lied to the McCarthey Investors about the performance of the Fund and the value of their investments in the Fund** ..................................................... 21

  o **August 2003 False and Misleading Statements** .................... 21

  o **Shah's January 30, 2004 False and Misleading Statement** ....... 22

  o **In February 2004, Shah Sent the Petitioners Materially False and Misleading Weekly E-Mails about the profit and loss of the Fund** ............................................................... 23

  o **During the period March 1, 2004 to April 2, 2004, Shah Sent the McCarthey Investors a series of Materially False and Misleading E-Mails about the Profit and Loss of the Fund** ...... 23

  o **The evidence presented to the Arbitration Panel showed that in April, May and June 2004, Shah was making so many false representations about the value and/or performance of the Linuxor Fund to so many different people, that he could not seem to keep his lies straight** ......................................... 24

- **During 2002, Shah took $214,200 of management fees out of the Fund, which was $111,000 more than he was entitled to take under the terms of the Investment Management Agreement** ................. 24

- **In April 2004, Shah overpaid the two other investors in the Fund, Phil Egger and James Temple, a total of $1.3 million more than they should have been paid – which money came dollar for dollar out of the McCarthey's pocket** ........................ 26

- **Shah Failed to Commence an Orderly Liquidation of the Fund on or around May 17, 2004, causing the McCarthey Investors to incur an additional $1.38 million in losses** .............................. 27

- **Amazingly, Shah continued to defraud the McCarthey Investors even after the Fund was closed, operations ceased and Shah informed them that he had fully redeemed their investment** .......... 27

2. THE EVIDENCE IN THE ARBITAL RECORD IS CLEAR THAT RESPONDENTS BREACHED THEIR FIDUCIARY DUTIES TO PETITIONERS…………………………………………………….. 28

3. RESPONDENTS HAVE FAILED TO ESTABLISH THAT THE ARBITRATION PANEL MANIFESTLY DISREGARDED THE LAW WITH REGARD TO THE APPLICATION OF THE NFA STATUTE OF LIMITATIONS….......................................................... 30

4. RESPONDENTS HAVE FAILED TO ESTABLISH THAT THE ARBITRATION PANEL MANIFESTLY DISREGARDED THE LAW IN APPLYING THEIR CLAIMS OF SUBSTANTIVE STATUTES OF LIMITATIONS…………………………………………….. 33

CONCLUSION…….……………………………………………………………... 37

# TABLE OF AUTHORITIES

## CASES

Applied Industrial Materials Corp. v. Ovalar Makine Ticaret Ve Sanayi, A.S.,
   492 F.3d 132 (2d Cir. July 9, 2007)....................................................... 10
Basic, Inc. v. Levinson, 485 U.S. 224 (1988)............................................... 16
Bear Stearns Home Equity Trust v. First Union Home Equity Bank,
   2002 U.S. Dist. LEXIS 10047 (S.D.N.Y. 2002)......................................... 3
Bell Aerospace Company Division of Textron, Inc. v. Local 516,
   500 F.2d 921 (2d Cir. 1974)................................................................. 11
Benfield v. Mocatta Metals Corp., 26 F.3d 19, 22 (2d Cir. 1994)............................ 35, fn 8
Carden v. Arkoma Assoc., 494 U.S. 185 (1990)............................................... 6
Catskill Litigation Trust, et al. v. Park Place Entertainment Corp.,
   169 Fed. App. 658 (2d Cir. Mar. 8, 2006)................................................. 5
Cosgrove v. Bartolotta, et. al., 150 F.3d 729 (7th Cir. 1998).................................. 6
Commonwealth Coatings Corp. v. Continental Casualty Co. et al.,
   393 U.S. 145 (1968)..........................................................................10
DiRussa v. Dean Witter Reynolds, Inc., 121 F.3d 818, 821 (2d Cir. 1997)........... ......... 15, 33, 34
Dodds v. Cigna Securities, Inc., 12 F.3d 346, 350 (2d. Cir. 1993)............................35, fn 8
Dyer v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 928 F.2d 238, 240 (7th Cir. 1991)... 35, fn 8
E.R. Squibb & Sons v. Accident & Cas. Ins. Co., 160 F.3d 925, 931 (2d Cir. 1998)......... 3
Ernst & Ernst v. Hochfelder, 425 U.S. 185, 193-94 n.12 (1977)............................... 16
Florasynth, Inc. v. Alfred Pickholz, 750 F.2d 171, 172 (2d Cir. 1984)........................ 8, 9, 10
Gwynn v. Clubine, 302 F. Supp. 2d 151, 166 (D.N.Y. 2003).................................. 16
Halligan v. Piper Jaffray, Inc., 148 F.3d 197, 202 (2d Cir. 1998)............................. 15, 32, 33
Handelsman v. Bedford Village Associates Limited Partnership,
   213 F.3d 48, 51-52 (2d Cir. 2000)......................................................... 5, 6
In re Merrill Lynch & Co., Inc. Research Reports Securities Litigation,
   289 F.Supp.2d 416, 424 (S.D.N.Y. 2003)................................................. 35, fn 7
International Produce, Inc. v. A/S Rosshavet, 638 F.2d 548, 551 (2d Cir. 1981)............ 10
Lanzi v. Brooks, 54 A.D. 2d, 1057, 388 N.Y.S. 946 (3rd Dept. 1976)......................... 17
LC Capital Partners, LP v. Frontier Insurance Group, Inc. et al.,
   318 F.3d 148, 154 (2d Cir. 2003)........................................................... 35, fn 7
Lucent Technologies Inc. v. Tatung Co., 379 F.3d 24, 29 (2d Cir. 2004)..................... 12
Maloley v. R.J. O'Brien & Associates, Inc., 819 F.2d 1435, 1439 (8th Cir. 1987)........... 35, fn 8
Merrill Lynch, Pierce, Fenner & Smith, Inc., et al., v. Alexander S. Lambros, Jr.,
   1 F. Supp. 2d 1337, 1342 (D.C. Fla. 1998)................................................. 12
Morelite Construction Corp. v. New York City Dist. Council Carpenters Ben. Funds,
   748 F.2d 79 (2d Cir. 1984)................................................................. 10 & fn 2
Navarro Savings Assn. v. Lee et al., 446 U.S. 458, 464 (1980)................................ 3
Porzig v. Dresdner, Kleinwort, Benson, N. Am. LLC,
   2007 U.S. App. LEXIS 18674, *9 (2d Cir. 2007)....................................... 7, 8
Reed & Martin, Inc. v. Westinghouse Electric Corporation,
   439 F.2d 1268, 1275 (2d Cir. 1971)....................................................... 12

Rothman v. Gregor , 220 F.3d 81, 97 (2d Cir. 2000)...................................31, fn 6; 35, fn 7
Rotter v. Leahy, 93 F.Supp.2d 487, 500 (S.D.N.Y. 2000)....................................... 35, fn 8
Shad v. Dean Witter Reynolds, 799 F.2d 525, 530 (9th Cir. 1986)............................ 16
Southland Sec. Corp. v. INSpire Ins. Solutions Inc., 365 F.3d 353, 362 (5th Cir. 2004).... 16
Sundstrand Corp. v. Sun Chemical Corp., 553 F.2d 1033, 1045 (7th Cir. 1977)..............17, fn 6
Wallace v. Buttar, 378 F.3d 182, 189-90 (2d Cir. 2004)............................................ 15, 34
Weiss, Peck & Greer, L.L.C. and Roger Weiss, v. Susan Robinson,
        2003 U.S. Dist. LEXIS 4009 (S.D.N.Y. 2003)...........................................29
Willemijn Houdstermaatschappij, BV v. Standard Microsystems Corp.,
        103 F.3d 9, 13 (2d Cir. 1997)............................................................ 15
Wyser-Pratte Management Co., Inc. v. Telxon Corp.,
        413 F.3d 553, 562-63 (6th Cir. 2005).....................................................31, fn 6
Young v. Lepone, 305 F.3d 1, 10 (1st Cir. 2002)...................................................31, fn 6

## STATUTES

7 U.S.C. § 25.............................................................................................35
9 U.S.C. § 10(a)....................................................................................... 7, 14
9 U.S.C. § 10(a)(2).........................................................................................10
9 U.S.C. § 12.................................................................................................8
28 U.S.C. § 1658..........................................................................................34
28 U.S.C. § 1332....................................................................................1, 3, 4

Utah Code Ann. § 61-1-22(7)(a)......................................................................35

NFA Code of Arbitration §6029.3................................................................. 12
NFA Code of Arbitration §6035.....................................................................34
NFA Code of Arbitration §6041.1............................................................. 32, 33
NFA Code of Arbitration §6053.5..................................................................13

Petitioners McCarthey Investments LLC, the 2001 Jane F. McCarthey GRAT No. 5 – Article Second and JFM Holdings, L.P. (collectively "the McCarthey Investors" or "Petitioners"), by and through their attorneys, hereby file their Reply Memorandum in Response to Respondents' Opposition to Petition to Confirm Arbitration Awards ("Opposition Memorandum").

## INTRODUCTION

This Court has subject matter jurisdiction over each of the three separate Petitions to Confirm Arbitration Awards under 28 U.S.C. § 1332. Under 28 U.S.C. § 1332, the federal courts have subject matter jurisdiction where there is diversity of citizenship between the petitioners and the respondents and the amount in controversy exceeds $75,000. See 28 U.S.C. § 1332. As set forth herein, there is complete diversity of citizenship between the Petitioners and Respondents, and each of the arbitration awards upon which the three separate Petitions are based exceeds the $75,000 jurisdictional minimum.

In their Opposition Memorandum Respondents' have raised purported defenses to the arbitration awards, however, because Respondents failed to move to vacate, modify or correct the arbitration awards within the three month period specified in Section 9 of the Federal Arbitration Act, they are now precluded from raising any defenses to the Arbitration Awards.

Respondents argue that the Arbitration Awards should be vacated because of the alleged bias and corruption of the arbitrators. However, Respondents have failed to establish any basis upon which the arbitration awards should not be confirmed. Respondents' false, immaterial and unsubstantiated assertions about the arbitration panel members fail to meet the evident partiality standard upon which an arbitration award may be challenged.

Respondents argue that the arbitration panel erroneously issued its awards because it

failed to credit their contentions that Petitioners did not establish Respondents' wrongful conduct and that the Petitioners' claims were time-barred under NFA arbitration rules and applicable statutes of limitation. As explained herein, Respondents' rehashing of the evidence presented to the arbitration panel falls far short of meeting the heavy burden necessary to establish manifest disregard of the law by the arbitration panel. Respondents assert that the hearing panel acted in manifest disregard of the law in finding that Respondents engaged in fraudulent conduct under the federal securities laws, the federal commodities laws, Utah securities law and the common law. However, the evidence in the arbital record is overwhelming that Respondents engaged in egregious and persistent fraud and breached their fiduciary duty. Furthermore, Respondents' contention that the arbitration panel manifestly disregarded statutes of limitation is an inappropriate attempt to recast their arguments about the evidence presented to the arbitration panel. Respondents' challenge to the award based merely upon its continued assertion that the arbitration panel reached a wrong factual conclusion about the date on which Petitioners should have filed their Statements of Claim certainly does not meet the high burden of establishing that the arbitration panel refused to apply or ignored a governing legal principle that was well defined, explicit, and clearly applicable to the case.

## ARGUMENT

**I.    THIS COURT HAS SUBJECT MATTER JURISDICTION OVER EACH OF THE THREE SEPARATE PETITIONS TO CONFIRM ARBITRATION AWARDS UNDER 28 USC § 1332**

On March 5, 2007, an arbitration panel of the National Futures Association issued an arbitration award to Petitioner McCarthey Investments, LLC in the amount of $4,054,847, a separate award to Petitioner 2001 Jane F. McCarthey GRAT No. 5 in the amount of $1,216,453 and a third separate award to Petitioner JFM Holdings, L.P. in the amount of $4,054,847. **Bazil**

2

**Affidavit, ¶9,** attached hereto as **Exhibit A**. On June 7, 2007, Petitioner McCarthey Investments, LLC filed a Petition to Confirm an Arbitration Award in the U.S. District Court for the Southern District of New York. That Petition was assigned index number 07cv5617. Separately, on June 7, 2007, Petitioner 2001 Jane F. McCarthey GRAT No. 5 filed a Petition to Confirm an Arbitration Award in the U.S. District Court for the Southern District of New York. That Petition was assigned index number 07cv5618. Also separately, on June 7, 2007, Petitioner JFM Holdings, L.P. filed a Petition to Confirm an Arbitration Award in the U.S. District Court for the Southern District of New York. That Petition was assigned index number 07cv5619.

Under 28 U.S.C. § 1332, the federal courts have subject matter jurisdiction where there is diversity of citizenship between the petitioners and the respondents and the amount in controversy exceeds $75,000. See 28 U.S.C. § 1332. As set forth above, each of the arbitration awards upon which the three separate Petitions are based exceeds the jurisdictional minimum.

Respondents make no claim that this court lacks subject matter jurisdiction with respect to the Petition filed by 2001 Jane F. McCarthey GRAT No. 5 (index number 07cv5618). Petitioner 2001 Jane F. McCarthey GRAT No. 5 is a trust created under Alaska law. For purposes of diversity jurisdiction, the citizenship of a trust is that of its individual trustees that possess the power to hold, manage and dispose of trust assets. See Navarro Savings Assn. v. Lee et al., 446 U.S. 458, 464 (1980) ("Trustees of an express trust are entitled to bring diversity actions in their own names and upon the basis of their own citizenship"); E.R. Squibb & Sons v. Accident & Cas. Ins. Co., 160 F.3d 925, 931 (2d Cir. 1998); Bear Stearns Home Equity Trust v. First Union Home Equity Bank, 2002 U.S. Dist. LEXIS 10047 (S.D.N.Y. 2002)(for purposes of diversity jurisdiction, the citizenship of a business trust is that of its trustees)[1]

---

[1] Accompanying this reply memorandum is a Motion for Leave to Amend Petitions to set forth allegations sufficient to demonstrate the basis upon which the Court's subject matter jurisdiction depends.

Phillip G. McCarthey, John O'Brien and Alaska Trust Company are the only three trustees of the 2001 Jane F. McCarthey GRAT No. 5 trust. Phillip G. McCarthey and John O'Brien reside in Utah and have lived and worked in Utah for over 20 years. The Alaska Trust Company is a corporation organized under the laws of the state of Alaska and maintains its principal place of business in Anchorage, Alaska. **McCarthey Affidavit, ¶5**, attached to Amended Petitions to Confirm Arbitration Award. Accordingly, for diversity of citizenship purposes under 28 USC §1332, each of the trustees of the 2001 Jane F. McCarthey GRAT No. 5 trust is domiciled in either the state of Alaska or Utah.

By contrast, none of the Respondents are domiciled in either the state of Alaska or Utah. Respondent Abbas A. Shah is an individual residing at 188 East 78th Street, Apartment 11A, New York, New York. **Affidavit of Abbas A. Shah, ¶2** attached to Respondents' Opposition Memorandum. Respondents Linuxor Capital Management, LLC ("LCM") and Linuxor Asset Management, LLC ("LAM") are Delaware limited liability companies and Abbas A. Shah is the managing member of both LCM and LAM. **Affidavit of Abbas A. Shah, ¶2**. According to Shah's sworn deposition, the transcript of which was an exhibit in the NFA arbitration, there were two other members of LCM and LAM, Adam Bornstein and Tydus Richards. Mr. Bornstein is not domiciled in either the state of Alaska or Utah. Mr. Bornstein testified that he resided in New York until January 2003 at which time he relocated to China, where he currently lives and works. **Bazil Affidavit, ¶13**. Moreover, Mr. Bornstein's membership interests in LCM and LAM were redeemed prior to the filing of the three Petitions. **Bazil Affidavit, ¶13**. Tydus Richards, who lives and works in the state of California, is also not domiciled in either the state of Alaska or Utah. **Bazil Affidavit, ¶13**. Accordingly, under 28 USC § 1332, there is diversity of citizenship between Petitioner 2001 Jane F. McCarthey GRAT No. 5 and the

4

Respondents and this Court has subject matter jurisdiction over this Petition.

Respondents incorrectly assert that because Petitioner McCarthey Investments, LLC and Petitioner JFM Holdings L.P. are organized under the same state law (Delaware) as are two of the three Respondents, LAM and LCM, that there is no diversity of citizenship to establish federal subject matter jurisdiction over these two Petitions. See Opposition Memorandum, p. 6. It is well-established law in this Circuit that the state of organization of limited liability companies and limited partnerships is wholly immaterial in determining the citizenship of such entities. As explained below, diversity of citizenship exists between Petitioners and Respondents and this Court has subject matter jurisdiction over these two petitions as well.

Petitioner McCarthey Investments, LLC is a limited liability company. For diversity purposes, the citizenship of a limited liability company is the citizenship of each of its members. See Handelsman v. Bedford Village Associates Limited Partnership, 213 F.3d 48, 51-52 (2d Cir. 2000); Catskill Litigation Trust, et al. v. Park Place Entertainment Corp., 169 Fed. App. 658 (2d Cir. Mar. 8, 2006).

The members of Petitioner McCarthey Investments, LLC are Trust Under Article Second of the Jane F. McCarthey GRAT No. 1; Trust Under Article Second of the Jane F. McCarthey GRAT No. 4; Trust Under Article Second of the Jane F. McCarthey GRAT No. 5; and Trust Under Article Second of the Jane F. McCarthey GRAT No. 8. Under the terms of each of these trusts, the trustees have the sole and absolute authority to hold, manage and dispose of the assets of the trust. Phillip G. McCarthey, John O'Brien, and Alaska Trust Company are the sole trustees of each of the foregoing trusts. Phillip G. McCarthey and John O'Brien have each lived and worked in Utah for over 20 years. Alaska Trust Company is a corporation organized under the laws of the state of Alaska and maintains its principal place of business in Anchorage,

5

Alaska. **McCarthey Affidavit, ¶3**. Accordingly, each of the members of Petitioner McCarthey Investments, LLC is domiciled in either the state of Alaska or Utah for diversity of citizenship purposes.

As set forth above, by contrast, none of the Respondents are domiciled in either the state of Alaska or Utah. Respondent Abbas A. Shah resides in New York, Respondent LCM is domiciled in either the states of New York or California and Respondent LAM is domiciled in either the states of New York or California. Accordingly, there is diversity of citizenship between Petitioner McCarthey Investments, LLC and the Respondents and this Court has subject matter jurisdiction over this Petition.

Petitioner JFM Holdings, L.P. is a limited partnership. For diversity purposes, the citizenship of a limited partnership is the citizenship of each of its general and limited partners. See Carden v. Arkoma Assoc., 494 U.S. 185 (1990); Handelsman v. Bedford Village Associates Limited Partnership, 213 F.3d 48, 51-52 (2d Cir. 2000); Cosgrove v. Bartolotta, et. al., 150 F.3d 729 (7th Cir. 1998). Each partner of Petitioner JFM Holdings L.P. is domiciled in either the state of Alaska or Utah. The general partner of Petitioner JFM Holdings, L.P. is JFM Capital Management, LLC, a Delaware limited liability company. The sole members of JFM Management, LLC are Trust Under Article Second of the Jane F. McCarthey GRAT No. 1; Trust Under Article Second of the Jane F. McCarthey GRAT No. 4; Petitioner Trust Under Article Second of the Jane F. McCarthey GRAT No. 5; and Trust Under Article Second of the Jane F. McCarthey GRAT No. 8. The limited partners of Petitioner JFM Holdings L.P. are Trust Under Article Second of the Jane F. McCarthey GRAT No. 1; Trust Under Article Second of the Jane F. McCarthey GRAT No. 4; Petitioner Trust Under Article Second of the Jane F. McCarthey GRAT No. 5; and Trust Under Article Second of the Jane F. McCarthey GRAT No. 8. As

stated above, Phillip McCarthey, John O'Brien and Alaska Trust Company are the three trustees of each of the foregoing trusts. Accordingly, each of the members of Petitioner JFM Holdings, L.P. is domiciled in either the state of Alaska or Utah. **McCarthey Affidavit , ¶4.**

As set forth above, by contrast, none of the Respondents are domiciled in either the state of Alaska or Utah. Respondent Abbas A. Shah resides in New York, Respondent LCM is domiciled in either the states of New York or California and Respondent LAM is domiciled in either the states of New York or California. Accordingly, there is diversity of citizenship between Petitioner JFM Holdings, L.P. and the Respondents and this Court has subject matter jurisdiction over this Petition as well.

## II. RESPONDENTS FAILED TO MOVE TO VACATE, MODIFY OR CORRECT THE ARBITRATION AWARDS WITHIN THE THREE MONTH PERIOD SPECIFIED IN SECTION 9 OF THE FEDERAL ARBITRATION ACT, AND ARE THEREFORE PRECLUDED FROM RAISING ANY DEFENSES TO THE ARBITRATION AWARDS.

The Second Circuit "has repeatedly recognized the strong deference appropriately due arbitral awards and the arbitral process, and has limited its review of arbitration awards in obeisance to that process." See Porzig v. Dresdner, Kleinwort, Benson, N. Am. LLC, 2007 U.S. App. LEXIS 18674, *9 (2d Cir. Aug. 7, 2007). Indeed, the Second Circuit has explicitly stated that it employs an "extremely deferential standard of review for arbitral awards and will not wander from the narrow grounds to vacate an arbitration award identified by statute." See Porzig, 2007 U.S. App. LEXIS 18674, *9. There are only four grounds set forth in the Federal Arbitration Act ("FAA") upon which an arbitration award may be challenged: (1) where the award was procured by corruption, fraud or undue means; (2) where there was evident partiality or corruption in the arbitrators; (3) where the arbitrators were guilty of misconduct in refusing to postpone the hearing or hear evidence pertinent and material to the controversy or misbehavior

7

prejudicial to a party; or (4) where the arbitrators exceeded their powers. See 9 U.S.C. §10(a). The Second Circuit recognizes only one other nonstatutory basis: where it finds the panel acted in manifest disregard of the law. See Porzig, 2007 U.S. App. LEXIS 18674, *12-13). The law in the Second Circuit is that an arbitration award will be vacated only upon a finding of a violation of one of the four statutory bases, or in the very rare instance in which an arbitration panel has acted in manifest disregard of the law. See Id.

The law in the Second Circuit is that a party aggrieved by an arbitration award at the conclusion of an arbitration proceeding must raise his defenses to it within the period prescribed by law. Under the FAA, notice of any motion to vacate, modify, or correct an award must be served upon the adverse party or his attorney within three months after the award is filed or delivered. See 9 U.S.C. § 12. There are no exceptions to the three month limitations period. Under the FAA, a party may not raise arguments in support of a motion to vacate, modify, or correct an arbitration award after the three month period has run, even when raised as a defense to a motion to confirm. See Florasynth, Inc. v. Alfred Pickholz, 750 F.2d 171, 172 (2d Cir. 1984) ("When a losing party has important defenses to an arbitration award he should raise them promptly instead of later attempting to oppose what should be a routine confirmation motion.").

In Florasynth, the issue before the Second Circuit was "whether a party aggrieved by an award at the conclusion of an arbitration must raise his defenses to it within the period prescribed, or whether he may sit that time out and make his motion to vacate as a defense to his opponent's motion to confirm." See Id. After the arbitration panel rendered its award, the aggrieved party remained silent for four months, making no attempt to move to vacate the final arbitration award within the three month time period allotted for such motion under the FAA. The aggrieved party, in an attempt to correct what he believed was an unjust arbitration award,

argued that the time limitations in 9 U.S.C. §12 on motions to vacate, modify or correct did not apply when raising defenses against a motion to confirm.    The Second Circuit disagreed, holding that the aggrieved party's "failure to move to vacate the award within the three month time provided preclude[d] him from later seeking that relief when a motion is made to confirm the award." Id. at 175.

With respect to the Petitions in this case, Respondents belatedly raise grounds in defense, for example, by alleging evident partiality of the panel members and by alleging that the panel manifestly disregarded the law in rendering the awards.    The Arbitration Panel rendered its awards on March 5, 2007 after hearing testimony and reviewing both evidence presented by Petitioners in support of its claim against Respondents and evidence presented by Respondents in defense of such claims.  **Bazil Affidavit, ¶9.**  On March 15, 2007, the three awards were duly served by the NFA on Respondents.  **Bazil Affidavit, ¶9.**  At no time from March 15, 2007 through June 15, 2007 did Respondents provide any notice that they would assert any grounds to vacate, modify or correct the arbitration award.  In fact, Respondents did not give notice of any arguments to support vacatur, modification or correction of the three arbitration awards until September 7, 2007, when Respondents filed papers in opposition to the instant petition to confirm the awards. **Bazil Affidavit, ¶12.**  Accordingly, Respondents are legally precluded from asserting any defenses to, or attempting to thwart the confirmation of the Arbitration Awards.

## III.  RESPONDENTS HAVE FAILED TO ESTABLISH ANY BASIS UPON WHICH THE ARBITRATION AWARDS SHOULD NOT BE CONFIRMED.

### A. RESPONDENTS' FALSE, IMMATERIAL AND UNSUBSTANTIATED ASSERTIONS ABOUT THE ARBITRATION PANEL MEMBERS FAIL TO MEET THE EVIDENT PARTIALITY STANDARD UPON WHICH AN ARBITRATION AWARD MAY BE CHALLENGED.

Respondents argue that the case at hand involved bias, corruption and impropriety on the

9

part of the arbitrators. Where an arbitrator is alleged to have acted with bias, under the FAA, an arbitration award will be disturbed only when there is established evident partiality by the arbitrators, or any of them. See 9 U.S.C. §10(a)(2); see also Commonwealth Coatings Corp. v. Continental Casualty Co. et al., 393 U.S. 145 (1968). Respondents' assertions with regard to the arbitrators in the case at hand do not satisfy this standard.

In the Second Circuit, evident partiality will be found only where a reasonable person would have to conclude that an arbitrator showed improper favoritism to one party to the arbitration. See Applied Industrial Materials Corp. v. Ovalar Makine Ticaret Ve Sanayi, A.S., 492 F.3d 132 (2d Cir. July 9, 2007); Morelite Construction Corp. v. New York City Dist. Council Carpenters Ben. Funds, 748 F.2d 79 (2d Cir. 1984). The appearance of bias does not constitute "evident partiality" in this Circuit. See International Produce, Inc. v. A/S Rosshavet, 638 F.2d 548, 551 (2d Cir. 1981); see also Florasynth at 173. In this case, Respondents' allegation of bias are false and would not constitute evidence of evident partiality on the part of the arbitrators even if true.

With respect to Charles P. Nastro, chairman of the arbitration panel, Respondents assert: (1) that Mr. Nastro is a former head of the NFA[2]; and (2) that Mr. Nastro failed to "question evidentiary documents submitted by the NFA." See Opposition Memorandum, p. 8. The NFA was not a party to the arbitration and did not submit any documents into evidence. Rather, at the hearing Petitioners offered various documents into evidence, including correspondence between the NFA Staff and Respondents and documents subpoenaed from the NFA in connection with the arbitration proceeding. With regard to each such document, Icksoo Park, an NFA examiner,

---

[2] The fact that Mr. Nastro is a former head of the NFA does not establish his evident partiality. Indeed, the Second Circuit has noted that "parties agree to arbitrate precisely because they prefer a tribunal with expertise regarding the particular subject matter of their dispute." See Morelite at 83.

testified at the hearing under oath and authenticated each document. Respondents were permitted to cross-examine Mr. Park, attempt to impeach his credibility, make objections to the admission of the documents into evidence and submit evidence to contradict or at least bring into question the veracity of the exhibits. **Bazil Affidavit, ¶14.** The fact that an arbitration panel member, who was once the head of the NFA, accepts into evidence properly authenticated documents that were in the possession of or were prepared by the NFA Staff does not establish evident partiality. Indeed, accepting into evidence properly authenticated documents does not show any bias against Respondents or for Petitioners. Cf. Bell Aerospace Company Division of Textron, Inc. v. Local 516, 500 F.2d 921 (2d Cir. 1974) (finding that an arbitrator's consistent reliance on evidence in reaching conclusions favorable to one party, absent evidence of bias, prejudice, predisposition to favoring either party or improper motives, does not establish evident partiality).

With respect to arbitration panel member James D. Yellen, Respondents make two completely false statements: (1) that Mr. Yellen was a school classmate of Petitioners' attorney, Anthony W. Djinis, Esq.; and (2) that Mr. Yellen and Mr. Djinis engaged in ex parte communications. See Opposition Memorandum p. 8. The online directory of the Fordham University School of Law discloses that Mr. Yellen, Adjunct Professor of Law at Fordham, received a B.A. from St. Lawrence University in 1977; a Masters in Education from St. Lawrence University in 1978; a license from the University of Navy, France in 1979 and a Juris Doctor degree from Fordham University School of Law in 1983. **Bazil Affidavit, ¶15.** Mr. Djinis has never attended any of these institutions. In fact, Mr. Djinis earned a Bachelor of Science in Physics from Rensselaer Polytechic Institute in 1971 and a Juris Doctor degree from St. John's University School of Law in 1974. **Bazil Affidavit, ¶15.** Regardless, as matter of

law, "a mere school relationship is too remote and speculative to constitute evident partiality." See Merrill Lynch, Pierce, Fenner & Smith, Inc., et al. v. Alexander S. Lambros, Jr., 1 F. Supp. 2d 1337, 1342 (D.C. Fla. 1998). Respondent's second statement is also false and unsubstantiated. The Panel, including Mr. Yellen, scrupulously observed a prohibition against ex parte communications with the parties and their counsel. Mr. Bazil was present at the hearing and at no time did he observe Mr. Djinis and Mr. Yellen engage in any ex parte communications. **Bazil Affidavit, ¶15.** In fact, Respondents fail to allege the substance of any discussions between Messrs. Yellen and Djinis. Respondents have not asserted any evidence that Mr. Yellen acted with evident partiality against Respondents.

With respect to Mr. Henry Maringer, Respondents assert (1) that Mr. Maringer was disciplined in a CFTC proceeding in 1986, and (2) that Mr. Maringer failed to disclose this information. See Opposition Memorandum p. 9. The NFA's website, which was available to the public at the time of the arbitration proceeding, disclosed Mr. Maringer's disciplinary matter. According to the NFA public disclosure, in 1986 Mr. Maringer, without admitting or denying the allegations of the CFTC, consented to an order alleging failure to supervise. **Bazil Affidavit, ¶16.** The NFA Code of Arbitration §6029.3 does not require arbitrators to disclose to the parties prior disciplinary events. Moreover, Respondents have failed to make any showing as to how Mr. Maringer's disciplinary event has biased him against Respondents. Thus, as a matter of law, Respondents have failed to establish any basis upon which the arbitration awards may be challenged. See Reed & Martin, Inc. v. Westinghouse Electric Corporation, 439 F.2d 1268, 1275 (2d Cir. 1971); see also Lucent Technologies Inc. v. Tatung Co., 379 F.3d 24, 29 (2d Cir. 2004).

Respondents also assert that the hearing process was faulty because the panel denied

their January 11, 2007 request to postpone the arbitral hearing in order to "secure funds for legal fees." See Opposition Memorandum p.9. Again, Respondents' assertions fall far short of the evident partiality standard.

Respondents neglect to advise the Court that on November 30, 2006 and December 1, 2006, the arbitration panel conducted 2 complete days of hearing, during which it listened to witnesses and accepted documents into evidence. Based upon the input of the parties, including Respondents, on December 5, 2006 the arbitration panel scheduled additional hearing dates for January 23, 2007 and January 24, 2007.[3] **Bazil Affidavit, ¶17.** Over the next five weeks, Respondents made no request to postpone the hearing or attempts to advise the arbitration panel that the hearing dates might pose a problem. Rather, on January 11, 2007, only two weeks before the resumption of the hearing, Respondents through their attorneys moved to adjourn the hearing until March or April 2007 in order to secure more funds to pay their attorneys. The hearing panel denied this request and reconvened the hearing as scheduled on January 23, 2007. **Bazil Affidavit, ¶ 17.**

The hearing panel acted appropriately and within the NFA rules in denying Respondents' request for a postponement of the hearing. Pursuant to the NFA Code of Conduct, the hearing panel is charged with the responsibility to conduct an orderly hearing and to establish the dates and times for parties to provide witnesses and documents. The NFA Code of Arbitration §6053.5 provides guidance to the hearing panel with respect to adjournments once the hearing has commenced, stating

> Extensions of time or postponements of the hearing may be granted by the Panel when the interests of justice so require, but a hearing in progress shall not be adjourned or interrupted except in compelling circumstances.

---

[3] Because the parties could not complete the case at that time, the arbitration panel requested the parties to propose two additional dates in January 2007 to complete the hearing.

13

Respondents provided no reason for requesting the postponement other than seeking some time to secure funding to pay their attorneys. Furthermore, the denial of the postponement by the hearing panel did not prejudice Respondents. When the hearing reconvened on January 23, 2007, Respondents were represented by the same counsel that had represented them throughout the proceeding. Respondents' counsel attended every day of the hearing, cross-examined Petitioners' witnesses, presented evidence in defense, delivered a closing argument and prepared a post-hearing brief, all before the arbitration awards were rendered. **Bazil Affidavit, ¶18.**

In their Opposition Memorandum, Respondents allege that an NFA supervisor, Cheryl Tulino, made insensitive and inflammatory comments to Respondent Abbas Shah. See Opposition Memorandum p.10. This allegation was never raised at any time during the arbitration proceeding. It should be noted that Ms. Tulino did not attend any of the hearing sessions in any capacity. Ms. Tulino was not an arbitration panel member. She did not testify as a witness for any party, and did not appear as a representative of the NFA or in any other capacity. **Bazil Affidavit, ¶19.** Accordingly, this assertion was not before the arbitration panel, and therefore, could not possibly have influenced the arbitration panel in any way. In any event, this allegation of misconduct by Ms. Tulino does not fall within the narrow specified grounds on which an award may be vacated under the Federal Arbitration Act. See 9 U.S.C. §10.

## B. RESPONDENTS' ATTEMPT TO RELITIGATE THE FACTS BEFORE THIS COURT FAILS TO MEET THE "MANIFEST DISREGARD" OF THE LAW STANDARD UPON WHICH AN ARBITRATION AWARD MAY BE CHALLENGED.

Respondents argue that the arbitration panel erroneously issued its awards because it failed to credit their contentions that (a) Petitioners did not establish Respondents' wrongful conduct; (b) the Petitioners claims were time-barred under NFA arbitration rules; and (c) three of

14

Petitioners' causes of action were time-barred based upon statutes of limitation. As is explained below, Respondents' rehashing of the evidence presented to the arbitration panel falls far short of meeting the heavy burden to establish manifest disregard of the law by the arbitration panel.

Manifest disregard means more than error or misunderstanding with respect to the law. See DiRussa v. Dean Witter Reynolds, Inc., 121 F.3d 818, 821 (2d Cir. 1997). Indeed, "[a] federal court cannot vacate an arbitral award merely because it is convinced that the arbitration panel made the wrong call on the law." See Wallace v. Buttar, 378 F.3d 182, 190 (2d Cir. 2004). In order to vacate or modify an award on this ground, a Court must find both that (1) the arbitrators knew of a governing legal principle yet refused to apply it or ignored it altogether, and (2) the law ignored by the arbitrators was well defined, explicit, and clearly applicable to the case. See Halligan v. Piper Jaffray, Inc., 148 F.3d 197, 202 (2d Cir. 1998); DiRussa at 821. "If there is even a barely colorable justification for the outcome reached, the court must confirm the arbitration award." See Willemijn Houdstermaatschappij, BV v. Standard Microsystems Corp., 103 F.3d 9, 13 (2d Cir. 1997)(internal quotations omitted).

## 1. THE EVIDENCE IN THE ARBITAL RECORD IS OVERWHELMING THAT RESPONDENTS ENGAGED IN EGREGIOUS AND PERSISTENT FRAUD.

Respondents assert that the hearing panel acted in manifest disregard of the law in finding that Respondents engaged in fraudulent conduct under the federal securities laws, the federal commodities laws, Utah securities law and the common law. Respondents, however, do not specify any legal principle that the arbitration panel should have applied, or that the arbitrators knew but chose to ignore a governing legal principle which would have required a different result. Rather, Respondents' Opposition Memorandum simply rehashes their failed arguments about the evidence presented to and adjudicated by the arbitration panel. "Under the manifest

disregard of the law doctrine, a mere erroneous factual determination is not a ground for vacating an arbitration award." See Gwynn v. Clubine, 302 F. Supp. 2d 151, 166 (W.D.N.Y. 2003)(citations omitted).   Respondents fail to meet the high burden for challenging the confirmation of the arbitration awards.

In any case, Respondent's factual assertions in their Opposition Brief are substantially inconsistent with the evidentiary record in the arbitration proceeding.  The evidence established at hearing unquestionably supported each of the elements necessary to find that Respondents' conduct was fraudulent.  Generally, to state a securities-fraud claim a party must plead (1) a misstatement or omission; (2) of a material fact; (3) made with scienter; (4) on which the plaintiffs relied; and (5) that proximately caused the plaintiffs' injuries. See, e.g., Southland Sec. Corp. v. INSpire Ins. Solutions Inc., 365 F.3d 353, 362 (5th Cir. 2004).   An omission or misstatement is material if it is substantially likely that a reasonable investor would have viewed the omitted or misstated fact as significantly altering the "'total mix' of information made available." See Basic, Inc. v. Levinson, 485 U.S. 224 (1988).  Scienter is a "mental state embracing intent to deceive, manipulate or defraud." See Ernst & Ernst v. Hochfelder, 425 U.S. 185, 193-94 n.12 (1977). This mental state is satisfied if the defendant acts recklessly in his fraud. See Shad v. Dean Witter Reynolds, 799 F.2d 525, 530 (9th Cir. 1986).

As documented at length herein, the overwhelming evidence presented to the Arbitration Panel clearly supported the arbitration panel's awards against Respondents.

- **Respondents fraudulently induced the McCarthey Investors to invest in the Linuxor Fund in March and May 2002 by making materially false and misleading representations about the Fund.**

In connection with the McCarthey Investors' investment, Shah falsely told Petitioners' investment manager, Phillip McCarthey:

16

- He was managing a Fund called Linuxor Global for which he had lined up about $100 million in investments.

- There were sophisticated overseas investors in the fund.

- That he had a successful strategy to limit the downside risk of loss.

Also in connection with the McCarthey Investors' investment, Shah omitted to disclose to the McCarthey Investors that in early 2002, pursuant to a secret finders' agreement, Shah paid Tydus Richard a finder's fee in connection with the McCartheys' investment in the Linuxor Fund.  The Confidential Offering Memorandum ("COM") for the Linuxor Fund failed to make required disclosure about the finder's fee paid by Shah to this unregistered third-party to recruit the McCarthey Investors. **Bazil Affidavit, ¶21.**

Each of Shah's statements was materially false and misleading.  Shah admitted that at the time he made these statements, the Fund had no investors, no money had been invested and the Fund had not even started trading. **Bazil Affidavit, ¶21.** Moreover, in his sworn deposition before the CFTC, Shah admitted that he never told Phil McCarthey that he was paying a finder's fee for "bringing McCarthey into the Linuxor Fund." **Bazil Affidavit, ¶21.** Furthermore, Shah not only abjectly failed to abide by the trading and investment policies set forth in the Confidential Information Memorandum (as described herein, <u>infra</u>) and did not put in place a mechanism to limit their downside risk of loss, Shah never once advised the McCarthey Investors of his actions.  See <u>Lanzi v. Brooks</u>, 54 A.D. 2d, 1057, 388 N.Y.S. 946 (3rd Dept. 1976).

- **In April 2002, after the McCartheys made an initial investment in the Fund of $1.5 million, Shah provided materially false and misleading performance results to McCarthey in order to induce the McCarthey Investors to make an additional $10 million investment in the Fund.**

Before the McCarthey Investors made their additional $10 million investment in the

Linuxor Fund, Shah told McCarthey that the initial investment was "up about 10%." **Bazil Affidavit, ¶22**. This statement was flatly false. In fact, during the period March 19, 2002 through April 18, 2002, the Fund suffered losses of $119,245 - losing $7.95% of its value. **Bazil Affidavit, ¶22**. McCarthey testified that Shah's false report to him in April 2002 that the Fund had made a 10% profit was a very important factor in his determination to invest another $10 million in the Fund. **Bazil Affidavit, ¶22**.

- **From March 2002 through July 2004, Respondents ran the Linuxor Fund in material contravention of the representations of the Offering Memorandum, causing over $6 million in damages to the Petitioners.**

Respondents failed to follow the Confidential Offering Memorandum ("COM") requirement that the Fund exit a trading strategy if the value of the Fund declined by more than 2%. The COM stated (page 7) in pertinent part:

> The Fund will exit an investing or trading strategy if such strategy causes the Fund to depreciate by an amount equal to or greater than 2% of the aggregate value of the Fund's assets.

**Bazil Affidavit, ¶23**.

The undisputed evidence in the record is that Shah repeatedly and materially violated this trading restriction. From October 2001 through January 31, 2003, Adam Bornstein worked at Respondent LAM for Respondent Abbas Shah, and was the only person working for Shah at such time. Bornstein testified that Shah did not follow this stated investment policy.

Respondents also failed to follow the COM requirement that the Fund cease trading for the remainder of any month in which the value of the Fund declined by more than 10%. The COM stated in pertinent part:

> The Fund will also cease trading for the remainder of any month in which trading reversals cause the Fund's aggregate value to depreciate by an amount greater than 10% of the aggregate value of the Fund as of the beginning of that month.

18

**Bazil Affidavit, ¶24**. Bornstein testified that Respondents failed to abide by this trading restriction as well. Jeffrey Rosen, a securities and commodities law expert, conducted an analysis of the Respondents' conduct of the fund and testified that:

- **In June 2002,** the Fund depreciated 14.35%, yet Respondents continued to trade in violation of policy.
- **In August 2002,** the Fund depreciated 32.95%, yet Respondents continued to trade in violation of policy
- **In December 2002,** the Fund depreciated 16.36%, yet Respondents continued to trade in violation of policy.
- **In February 2003,** the Fund depreciated 15.54%, yet Respondents continued to trade in violation of policy.
- **In March 2003,** the Fund depreciated 18.84%, yet Respondents continued to trade in violation of policy.
- **In May 2003,** the Fund depreciated 39.09%, yet Respondents continued to trade in violation of policy.
- **In February 2004,** the Fund depreciated 26.88%, yet Respondents continued to trade in violation of policy
- **In March 2004,** the Fund depreciated 33.20%, yet Respondents continued to trade in violation of policy.

**Bazil Affidavit, ¶24**. Shah also failed to follow the COM requirement that the Fund cease trading in the event the margin requirement for the Fund's commodities account exceeded 25%. From March 2002 to January 2003, Shah repeatedly and materially violated the margin limit restriction. The COM stated in pertinent part:

> Commodity interest positions will not generally be initiated (or increased) where the aggregate size of the position requires margin amounts greater than 25% of the Fund's assets allocated to the account.

**Bazil Affidavit, ¶25**. In August 2002, the Fund's prime broker, ABN AMRO, warned Shah that he had "repeatedly and materially exceeded the [margin] limit." **Bazil Affidavit, ¶25**. Bornstein testified that Respondents failed to abide by this trading restriction as well. Indeed, Bornstein testified that Shah knew that he had repeatedly and materially exceeded the margin limit and nonetheless continued to exceed the margin limit. **Bazil Affidavit, ¶25**. Respondents' violations of this investment policy through at least January 2003 were established through

Jeffrey Rosen's expert analysis.  In this regard, Mr. Rosen demonstrated to the arbitration panel that:

- **May 2002**: Initial margin of Fund's commodities account was 62.55%.  Respondents continued to initiate or increase commodity interest positions throughout **June 2002**.
- **June 2002**: Initial margin of Fund's commodities account was 59.45%. Respondents continued to initiate or increase commodity interest positions throughout **July 2002**.
- **July 2002**: Initial margin of Fund's commodities account was 46.78%. Respondents continued to initiate or increase commodity interest positions throughout **August 2002**.
- **December 2002**: Initial margin of Fund's commodities account was 50.38%. Respondents continued to initiate or increase commodity interest positions throughout **January 2003**.

**Bazil Affidavit, ¶25**.

In November 2002, ABN AMRO told Shah it would not provide prime brokerage services for him or his accounts and "would accept only liquidating (closing) transactions." **Bazil Affidavit, ¶26**. Nevertheless, Respondents not only failed to comply with the investment policy set forth in the COM, they concealed this fact from Petitioners.   **Bazil Affidavit, ¶26**. Undeterred, Shah closed the ABN AMRO account, liquidated certain of the positions and transferred the balance to Man Financial, where he promptly resumed his material violation of the COM investment policy. **Bazil Affidavit, ¶26**.  These were not mere technical violations: the Fund lost over $6 million as a result of Shah's failure to abide by the COM's investment restrictions. **Bazil Affidavit, ¶26**.

Respondents also failed to follow the COM requirement that the Fund retain an "independent representative" to verify that any Funds withdrawn from the Fund were proper.[4]

---

[4] The Confidential Offering Memorandum, p. 32., stated in pertinent part:
   [a]s a safekeeping measure, the Fund has agreed with its Prime Broker on specific procedures the General Partner and/or the Investment Manager must follow in order to withdraw capital from the Fund, or be reimbursed for expenses they have paid on behalf of the Fund.  Under that agreement, the Prime Broker may not transfer any Fund assets to the General Partner or the Investment Manager or to their affiliates for any reason until the Fund's "independent representative" has provided a letter directly to the Prime Broker confirming that it has performed certain procedures

Phil McCarthey testified that this safeguarding measure had an important role in his decision to invest in the Linuxor Fund. This was also not a mere technical violation. The evidence presented to the Arbitration Panel shows that without this important oversight mechanism, Shah extracted over $100,000 of management fees in excess of what he was permitted; furthermore, Shah misappropriated Fund assets belonging to the McCarthey Investors for various improper related party and self-dealing transactions.

- **Shah Repeatedly and Materially lied to the McCarthey Investors about the performance of the Fund and the value of their investments in the Fund.**

From April 2002 through September 2004, after the Fund had closed down, the Respondents did not send any quarterly, annual or other reports concerning the performance or financial condition of the Fund to the McCarthey Investors. **Bazil Affidavit, ¶28.** Instead of preparing or distributing annual or quarterly financial reports to the McCarthey Investors (or filing any such documents with the NFA as required by law), Respondents instead repeatedly and materially lied to the McCarthey Investors about the performance of the Fund and the value of their investments in the Fund.

  o **August 2003 False and Misleading Statements.**

In a telephone conversation with Phil McCarthey and Todd Brashear and in an e-mail dated August 25, 2003, Shah represented to McCarthey that from January 1, 2003 to August 25, 2003, the Fund earned over $2.49 million. **Bazil Affidavit, ¶29.** In fact, Shah's August 25, 2003 e-mail to Brashear and Shah's verbal representation to McCarthey and Brashear were false

---

to verify that the calculation of any amounts to be paid to the General Partner or the Investment Manager confirm to the Partnership Agreement and the Investment Management Agreement, respectively, and is mathematically accurate, and for proposing withdrawals of capital, that the amount to be withdrawn is less than the withdrawing Partner's Capital Account balance. **Bazil Affidavit, ¶27.**

in that from January 1, 2003 to August 25, 2003 the Fund <u>lost</u> $2,080,985. **Bazil Affidavit, ¶29**.

> o   **Shah's January 30, 2004 False and Misleading Statement.**

Shah sent to the McCarthey Investors' CFO, Todd Brashear, an e-mail dated January 30, 2004 which stated:

> Your account balance as of 12/30/03 was approximately:
> $8,095,000
> Realized:               $6,500,000
> Unrealized:             $1,595,000.

**Bazil Affidavit, ¶30**.  Shah's January 30, 2004 e-mail to Brashear was a materially false and misleading statement about the value of the McCarthey Investors' investment in the Linuxor Fund.   Contrary to Shah's representation that the value of the McCarthey Investors' investment in the Fund on December 30, 2003 was over $8 million, in fact the evidence presented to the Arbitration Panel was that the actual value of the McCarthey Investors' investment in the Fund on December 30, 2003 was $3,764,163, less than half Shah's claim. **Bazil Affidavit, ¶30**.

On cross-examination, Shah admitted that his January 30, 2004 e-mail to Brashear was false and that he made a "big mistake." <u>See</u> **Bazil Affidavit, ¶30**.   Indeed, in response to the Panel's questions to Shah about the basis upon which he calculated that the McCarthey Investors' account balance as of December 31, 2003 was $8,095,000, Shah admitted that he wrote the e-mail without any documents at his disposal and could not even explain how he arrived at the $8 million figure. **Bazil Affidavit, ¶30**.  In his sworn deposition in the civil action brought against him by the CFTC, Shah stated that a few months after that e-mail, when the NFA began its audit of Linuxor, he "recalculated" the actual net asset value of the fund on December 30, 2003 and determined that the e-mail to Brashear about the value of their account balance on that date "was about I think 4 odd million dollars" less than he represented.  **Bazil Affidavit, ¶30**.  McCarthey and Brashear each testified that Shah never advised them that the January 30,

2004 e-mail was incorrect in any respect, and in Shah's deposition Shah admitted he never sent a subsequent e-mail, letter or any document correcting his gross overstatement to the McCarthey Investors. **Bazil Affidavit, ¶30.**

  o **In February 2004, Shah Sent the Petitioners Materially False and Misleading Weekly E-Mails about the profit and loss of the Fund.**

  Pursuant to the demands of Petitioners, during the period from August 29, 2003 through May 31, 2004, Shah sent weekly e-mails to the Petitioners about the performance of the Fund. Shah's e-mails to the Petitioners during this period were materially false and misleading. For example, Shah represented to the Petitioners that for the month of February 2004 the Fund earned a <u>profit of $47,500</u>, whereas in truth for that month the Fund's actual performance was a <u>loss of $1,119,579</u>. **Bazil Affidavit, ¶31.**

  o **During the period March 1, 2004 to April 2, 2004, Shah Sent the McCarthey Investors a series of Materially False and Misleading E-Mails about the Profit and Loss of the Fund.**

  After making materially false written reports of the Fund's positive performance in February 2004 (rather than disclosing that the Fund actually lost over $1 million in that month), Shah continued to craft and send materially false e-mails to the McCarthey Investors over the next five weeks as the true value of the Fund continued to sharply decline. According to Shah's weekly e-mails to the McCarthey Investors about the profit or loss of the Fund during the period from March 1, 2004 to April 2, 2004, the Fund's performance was essentially flat (losing $3000 over the 5 week period). **Bazil Affidavit, ¶32.** The actual value of the Fund, as reflected in the Fund's bank and brokerage statements for that same period, <u>decreased by $282,464</u> over that time period. **Bazil Affidavit, ¶32.**

> o **The evidence presented to the Arbitration Panel showed that in April, May and June 2004, Shah was making so many false representations about the value and/or performance of the Linuxor Fund to so many different people, that he could not seem to keep his lies straight.**

In April 2004, Shah boasted to Todd Brashear that he was doing "gangbuster business" in the Fund during the first three months of the year, "beating all performance records." **Bazil Affidavit, ¶33.** When Brashear asked Shah about the value of the McCarthey Investors' investment in the Fund, Shah informed Brashear that the value of the investment was approximately $8.2 million. In response, Brashear told Shah that this figure seemed too low. Shah replied that he must have made a mistake and that he'd "check his numbers and call back." Shah later called back and revised the stated value of the investment to $9 million. **Bazil Affidavit, ¶33.**

In mid-May 2004, Shah advised Phil McCarthey that the value of the McCarthey Investors' investment in the Fund was $9.0 to $9.5 million. **Bazil Affidavit, ¶33.** In truth, as Shah has since admitted, the value of the McCarthey Investors' investment in the Fund was approximately $5.4 million. **Bazil Affidavit, ¶33.**

On June 3, 2004, Shah told Todd Brashear that the value of the McCarthey Investors' investment in the Fund was approximately $9.0 million. **Bazil Affidavit, ¶33.** In actuality, as proven through the Fund's bank and brokerage statements for June 3, 2004, the value of the McCarthey Investors investment in the Fund was only $4,923,874. **Bazil Affidavit, ¶33.**

> • **During 2002, Shah took $214,200 of management fees out of the Fund, which was $111,000 more than he was entitled to take under the terms of the Investment Management Agreement.**

During the first quarter of 2003, the Fund's independent auditor discovered Shah's material overcharge of management fees and instructed him to take corrective action. Not only did Shah fail to inform investors that he had overcharged them, Shah thumbed his nose at the

24

instructions of the Independent Auditor and continued to take management fees to which he was not entitled in 2003 and 2004.

The Fund's Investment Management Agreement ("IM Agreement") states in pertinent part: "[the] Fund will pay the Investment Manager a monthly fee . . . payable in arrears, and calculated at an annual rate of 2% of the Net Asset Value of the Fund." **Bazil Affidavit, ¶35**. John Zacharella, the independent auditor of Linuxor's financial statements for the year ending December 31, 2002, testified that:

- He reviewed the IM agreement to see how the management fee was supposed to be calculated.

- He noted that the IM Agreement stated that "the Fund will pay the Investment Manager a monthly management fee payable in arrears, and calculated at an annual rate of 2.0% of the Net Asset value of the Fund."

- He then reviewed the Fund's books and records to determine the amount of management fees that the Fund actually paid during that period.

- He prepared a work paper to reflect his review of the management fees charged to the Linuxor Fund.

- He found that in 2002, $214,200 was paid by the Linuxor Fund in management fees to LAM and that the amount of management fees that should have been charged to the Fund in 2002 was only $103,071.

- Thus, Zacharella concluded, Shah materially overcharged management fees in 2002 in the amount of $111,129.

**Bazil Affidavit, ¶35**.

Zacharella then had a conversation with Shah in the first quarter of 2003 in which he told Shah that Shah had overcharged $111,129 of management fees to the Fund. Shah did not, as he should have, cause LAM to repay the $111,129 owed to the Fund. Instead, Shah agreed with Zacharella's instruction not to take any more management fees from the Fund until it had earned an amount equal to the overcharge. **Bazil Affidavit, ¶36**. However, Shah immediately breached

his promise and continued to extract monies from the Fund in the amount of approximately $125,000, purportedly for management fees. Indeed, to underscore that Shah never intended to follow Zacharella's instruction, within weeks of promising to Zacharella not to take any more management fees from the Fund:

- On April 2, 2003: Shah withdrew $13,180.53 in cash from the Fund's securities account and deposited it into the Fund's advisers' bank account. **Bazil Affidavit, ¶36**.

- On May 12, 2003: Shah withdrew $10,000 in cash was withdrawn from the Fund's securities account and deposited it into the Fund's advisers' bank account.[5] **Bazil Affidavit, ¶36**.

The evidence in the record is that from September 1, 2003 to September 2, 2004 the Respondents caused the Fund to make unauthorized disbursements of approximately $102,000. **Bazil Affidavit, ¶37**.

Phil McCarthey testified that he read the management fee provision in the COM before making his investment in the Fund and that he understood that the Fund would be paying investment management fees to Shah at a rate of 2% per annum based upon the NAV of the Fund. Nevertheless, Shah never issued any reports about the amount of management fees that he had taken from the Fund, never gave the McCarthey Investors an oral report about the amount of management fees that he had taken from the Fund and at no time did Shah ever advise him that he had taken over $100,000 from the Fund that he was not entitled to take. **Bazil Affidavit, ¶37**.

- **In April 2004, Shah overpaid the two other investors in the Fund, Phil Egger and James Temple, a total of $1.3 million more than they should have been paid – which money came dollar for dollar out of the McCarthey's pocket.**

In April 2004, the two other investors in the Fund, Phil Egger and James Temple demanded their money back from Shah. Like other Ponzi schemes, the first investors to get out

---

[5] These withdrawals are also reflected in an analysis of the Linuxor Fund's account at Wexford Global, which was provided to the Panel under cover of letter dated January 12, 2007.

were paid with the remaining investor's money. In this case, Shah overpaid Egger and Temple nearly $1.3 million of the McCarthey Investors' money. **Bazil Affidavit, ¶38**.

- **Shah Failed to Commence an Orderly Liquidation of the Fund on or around May 17, 2004, causing the McCarthey Investors to incur an additional $1.38 million in losses.**

In mid-May 2004, Shah promised the NFA that he would immediately commence an orderly liquidation of the Fund. As Shah testified before the CFTC, "I think May 17 or May 18 when the NFA were aggressively pursuing us liquidating the funds, and at the time I believe [the Fund's NAV] was about $5.3 million, NAV." **Bazil Affidavit, ¶39**. In his July 21, 2006 affidavit that he filed with the Panel, Shah repeated that "the NFA inquiries initiated the orderly liquidation of the accounts, on or around May 17, 2004." **Bazil Affidavit, ¶39**. It is undisputed that on or about May 17, 2004, the value of the Linuxor Fund was approximately $5.38 million and that the McCarthey Investors were the sole investors in the Fund. **Bazil Affidavit, ¶39**. As the overwhelming evidence in the case presented to the Arbitration Panel clearly established, Shah did **not** commence an orderly liquidation of the Fund in mid-May 2004 and thereby caused the McCarthey Investors to incur an additional $1.38 million in losses. **Bazil Affidavit, ¶39**.

- **Amazingly, Shah continued to defraud the McCarthey Investors even after the Fund was closed, operations ceased and Shah informed them that he had fully redeemed their investment.**

As if his egregious, repeated and material lies to and frauds upon the McCarthey Investors during the operation of the Linuxor Fund were not enough, Shah continued to defraud the McCarthey Investors even after the Fund was closed. Indeed, despite his assurance to the NFA that he fully redeemed the McCarthey Investors' investments by paying the McCarthey Investors a total of $4,002,899, in reality Shah retained approximately $80,000, at least $37,000 of which was misappropriated. **Bazil Affidavit, ¶40**. For example:

- On June 29, 2004, Shah paid $7,500 to the Cayman Island attorneys to Shah's offshore hedge fund. There is absolutely no evidence that this law firm performed any service to the Linuxor Fund.

- From June 3 through July 31, 2004, Shah paid approximately $3000 in restaurant, limo and liquor bills.

- On December 20, 2004, Shah paid $11,500 in an attempt to bail out his failing private software company, Isospace.

- On January 24, 2005, Shah paid another $10,500 to Isospace.

**Bazil Affidavit, ¶40**. Indeed, on March 23, 2006, almost two years after the Fund ceased operations, there was still $5225 in the Fund's bank account that had not yet been returned to the McCarthey Investors. **Bazil Affidavit, ¶41**. Shah admitted that the decision to keep this portion of the money due the McCarthey Investors was his and his alone. **Bazil Affidavit, ¶41**.

Respondents' Opposition Memorandum does not identify any governing principles of law which were presented to the arbitration panel and subsequently ignored by the panel. Indeed, the arbitration panel did not manifestly disregard the law. In fact, based on the governing legal principles, Petitioners assert that the arbitration panel rightfully concluded that Respondents defrauded Petitioners.

### 2. THE EVIDENCE IN THE ARBITRAL RECORD IS CLEAR THAT RESPONDENTS BREACHED THEIR FIDUCIARY DUTIES TO PETITIONERS.

Respondents assert that the hearing panel acted in manifest disregard of the law in finding that Respondents breached their fiduciary duty to Petitioners. Respondents do not contend that no such duty exists; rather, Respondents contend that the arbitration panel ignored the terms of the Limited Partnership Agreement.

Respondents, however, fail to clearly identify the scope of the parties' agreement with respect to the possible breach of a fiduciary duty. The Limited Partnership Agreement states that

28

> Neither the General Partner, nor the Investment Manager, nor any member, employee, agent or other Affiliate of the General Partner, nor any board or body with respect to the General Partner or the Fund (each, an "Indimnitee") will be liable to the Fund or to any Partner for any act or omission performed or omitted by such Indimnitee in connection with this Agreement or the Fund's business or affairs and no such act of omission will in and of itself constitute a breach of any duty owed by any Indimnitee to the Fund or any Limited Partner hereunder or under the Act, <u>provided such act or omission did not constitute gross negligence or a willful violation of law.</u> (emphasis added)

<u>See</u> Respondents Exhibit B-2, Agreement of Limited Partnership, p. 16.  Under the clear terms of the Limited Partnership Agreement, Petitioners have the right to pursue breach of fiduciary claims against Respondents for any acts or omissions by Respondents that constitute gross negligence or willful violations of law.

As articulated in exhaustive detail above, Petitioners submitted a veritable mountain of evidence to the arbitration panel demonstrating that Respondents' acts and omissions were not merely grossly negligent and willful, but also fraudulent.  For example, Respondents recklessly breached their fiduciary duties and willfully violated the law by engaging in excessively risky trading strategies that violated the Fund's Investment Policies, misrepresenting the Fund's performance and the value of the McCarthey Investors' holdings, overpaying investors who redeemed their investments before the McCarthey Investors, and by misappropriating assets from the Fund.  <u>See</u> <u>e.g.</u> <u>Weiss, Peck & Greer, L.L.C. and Roger Weiss, v. Susan Robinson</u>, 2003 U.S. Dist. LEXIS 4009 (S.D.N.Y. 2003)(Arbitration panel's purported finding that the general partner of fund breached its fiduciary duty to an investor by failing to respond to investor's request was not a manifest disregard of the law)  Accordingly, the arbitration panel did not manifestly disregard the terms of the Limited Partnership Agreement.

3. **RESPONDENTS HAVE FAILED TO ESTABLISH THAT THE ARBITRATION PANEL MANIFESTLY DISREGARDED THE LAW WITH REGARD TO THE APPLICATION OF THE NFA STATUTE OF LIMITATIONS.**

Respondents' contention that Petitioners' claims were time-barred under NFA rules is a rehash of a factual dispute based upon the evidence presented to the Arbitration Panel by both parties. The parties and the arbitration panel fully appreciated that Rule 6035 of the NFA Code of Arbitration governs the timeliness of claims brought before the NFA arbitration department, and that Rule 6035 provides that the statute of limitations begins to run "two years from the date when the party filing the Arbitration claim <u>knew or should have known of the act or transaction that is the subject of the controversy.</u>" Respondents do not claim that the arbitration panel applied the wrong law in determining that Petitioners' claims were time-barred. Rather, by their own concession, Respondents' contention that Petitioners' claims were untimely turns upon two <u>evidentiary</u> determinations: (1) the precise date that Petitioners knew or should have known of the act or transaction that gave rise to all of their causes of action; and (2) the precise date that Petitioners filed their Statements of Claim. Specifically, Respondents then, as now, claimed that the date upon which the statute of limitations began to run is August 25, 2003. On that date, Respondents contend, Petitioners were sent 2002 Schedule K-1s for the Fund which allegedly put Petitioners on "inquiry notice" of Respondents' wrongful conduct. The Respondents are dead wrong. Rather, the evidence presented to the arbitration panel was that Petitioners did not receive the Schedule K-1s for the Fund until sometime after August 27, 2003 (less than 2 years before the Petitioners' Statement of Claims were filed on August 26, 2005).[6] Respondents

---

[6] It should be noted that even if Respondent's factual assertion that Petitioners received the 2002 Schedule K-1s on August 25, 2003 were correct, the NFA statute of limitations would still not have run with respect to any cause of action in this case. The majority view of the federal circuits, including the Second Circuit, holds that the mere discovery of suspicious facts that would cause a reasonable investor to investigate the possibility of wrongful conduct does not start the statute of limitations, but rather that the statute of limitations period begins to run

contend that the date Petitioners filed their Statements of Claim was October 25, 2005. <u>See</u> Opposition Memorandum, p. 17. Again, Respondents are dead wrong. The three Petitioners filed their Statements of Claim on August 26, 2005. In any event, Respondents' attempts to rehash factual determinations to which the arbitration panel applied their rules falls far short of the manifest disregard of law standard for challenging the confirmation of these arbitration awards.

To address Respondents' specific allegation that Petitioners knew or should have known of Respondents' wrongful actions giving rise to claims against them on August 25, 2003, Petitioners presented evidence to the arbitration panel that:

- From May 2002 through late August 2003, the Respondents did not send any quarterly annual or other reports concerning the performance or financial condition of the Fund to the Petitioners. Additionally, during that time neither Shah nor anyone else acting on behalf of the Respondents ever advise the Petitioners that they had suffered any material losses in connection with their investments in the Fund. **Bazil Affidavit, ¶42**.

- In late August 2003, Shah called Brashear to inform him that the Petitioners would be receiving the 2002 Schedule K-1s covering the Fund's performance through the end of December 2002, which would indicate a loss for 2002. Shah falsely represented that the loss was not greater than the downside risk parameters to which he had previously agreed to abide. Further, Shah falsely advised that since the end of 2002, the fund had recouped much of the Petitioners' losses. **Bazil Affidavit, ¶42**.

- In an e-mail dated August 25, 2003, Shah advised Brashear that although the K-1 would reflect a loss in the value of the investments as of December 31, 2002, Shah assured Brashear that the December 31, 2002 snapshot of the investment's performance was misleading and should not be cause for concern. **Bazil Affidavit, ¶42**.

- Despite Shah's promises to Brashear that Shah would provide him with the 2002 Schedule K-1s for the Fund, Shah did not provide these documents to Petitioners at any time. Mr. Brashear stated in his sworn affidavit that he received the 2002 Schedule K-1s from RKC by U.S. Mail sometime after August 27, 2003. **Bazil Affidavit, ¶42**.

- Sometime after August 27, 2003, the 2002 Schedule K-1s for the Fund were sent by the

---

thereafter only when a reasonably diligent investigation would have discovered the fraud. <u>See</u> <u>Rothman v. Gregor</u> , 220 F.3d 81, 97 (2d Cir. 2000); <u>Wyser-Pratte Management Co., Inc. v. Telxon Corp.</u>, 413 F.3d 553, 562-63 (6th Cir. 2005); <u>Young v. Lepone</u>, 305 F.3d 1, 10 (1st Cir. 2002).

Fund's certified public accountants, Rothstein, Kass & Company, P.C. along with a cover letter dated August 27, 2003. The Schedule K-1s contain a date and time of preparation of 6:20:55pm on August 27, 2003. **Bazil Affidavit, ¶42.**

In its August 14, 2006 order denying Respondents' motion to dismiss on statute of limitations grounds, the arbitration panel noted that it had conducted a preliminary hearing to decide Respondents' contentions and had reviewed and considered all written submissions relating to the matter. **Bazil Affidavit, ¶42.**

Respondents' challenge to the award, which is based merely upon their continued assertion that the arbitration panel reached the incorrect factual conclusion about the date Petitioners knew or should have known of Respondents' wrongful conduct, simply does not meet the high burden of establishing that the arbitration panel refused to apply or ignored a governing legal principle that was well defined, explicit, and clearly applicable to the case. See Halligan, 148 F.3d at 202; DiRussa, 121 F.3d at 821.

The evidence in the record that Petitioners filed their Statements of Claim on August 26, 2005, and not on October 25, 2005 as Respondents assert, is unequivocal. By facsimile and overnight delivery, Petitioners filed their Arbitration Claim Form, Statement of Claim, Certificate of Service and supporting exhibits with the NFA Arbitration Department on August 26, 2005. (NFA Case No. -05-ARB-107). That same day, a payment in the amount of $1550.00 was wired to the NFA's designated bank account to cover the filing fees. **Bazil Affidavit, ¶20.** Mr. Djinis' sworn affidavit as to these facts was submitted to the arbitration panel for the panel's consideration pursuant to its review of all facts relevant to this issue in opposition to Respondents' Motion to Dismiss.

Respondents neglect to acknowledge that another provision of the NFA Code of Arbitration, set forth in Rules 6041.1(a) and (b), provides that if the two-year time limit under

the NFA Code is close to expiring, a person wanting to file an Arbitration Claim may notify the NFA, either orally or in writing, of such person's intent to arbitrate. If a person who files a notice of intent to arbitrate decides to proceed with NFA arbitration, such person must serve an arbitration claim on the NFA within 35 days after the date the NFA provided the person with a copy of the Code and an Arbitration Claim Form. As was also set forth in Mr. Djinis' affidavit submitted to the arbitration panel in opposition to Respondents' Motion to Dismiss, on August 25, 2005 Mr. Djinis telephoned the NFA Arbitration Department during which call he provided to the department oral notice that the three Petitioners intended to file a Statement of Claim and arbitrate a claim before the NFA against the Respondents. Mr. Djinis specifically made this call to preserve Petitioners' right to file a statement of claim with the NFA. As stated above, Respondents filed their Statements of Claim with the NFA Arbitration Department the very next day on August 26, 2005. Thus, even under Respondents' version of the facts, Petitioners still timely filed their Statements of Claim with the NFA.

Respondents' challenge to the award based merely upon its continued assertion that the arbitration panel reached a wrong factual conclusion about the date on which Petitioners should have filed their Statements of Claim certainly does not meet the high burden of establishing that the arbitration panel refused to apply or ignored a governing legal principle that was well defined, explicit, and clearly applicable to the case. See Halligan v. Piper Jaffray, Inc., 148 F.3d 197 (2d. Cir. 1998); DiRussa v. Dean Witter Reynolds, Inc., 121 F.3d 818, 821 (2d Cir. 1997)

### 4. RESPONDENTS HAVE FAILED TO ESTABLISH THAT THE ARBITRATION PANEL MANIFESTLY DISREGARDED THE LAW IN APPLYING THEIR CLAIMS OF SUBSTANTIVE STATUTES OF LIMITATIONS.

Respondents have also asserted that the panel manifestly disregarded the law in finding that Petitioner's claims of federal securities fraud, federal commodity fraud, and securities fraud

under Utah law were not barred by applicable statutes of limitation. Petitioners claimed that the McCarthey Investors were fraudulently induced to invest in the Linuxor Fund in March and May 2002 through Respondent Shah's materially false and misleading representations, and that over the course of two and a half years until July 2004 Respondents engaged in numerous material misrepresentations, both verbally and in writing, regarding the Fund's management, value and performance to conceal from the McCarthey Investors the magnitude of the Fund's massive losses, thereby fraudulently inducing them to remain invested in the Fund. Once again, Respondents have failed to demonstrate that the panel manifestly disregarded the law.

As discussed above, manifest disregard means more than error or misunderstanding with respect to the law, see DiRussa, 121 F.3d at 821, and a federal court will not vacate an award based merely on a conclusion that the panel was incorrect. Wallace, 378 F.3d at 189-90. Again, Respondents have the heavy burden of demonstrating that a legal error is obvious and capable of being readily and instantly perceived by the average person qualified to serve as an arbitrator, and the arbitrator decided to ignore or disregard a clearly governing legal principle the existence of which he appreciates. See DiRussa, 121 F.3d at 821.

Private rights of action arising under the federal securities laws and regulations thereunder which involve claims of fraud, deceit, manipulation or contrivance are subject to the statue of limitations set forth in 28 U.S.C. §1658 as established by the Sarbanes-Oxley Act of 2002. This section provides that such private rights of action must be brought no later than two years after the discovery of the facts constituting the violation, or five years after the violation, whichever comes first.[7] Claims arising under the Commodity Exchange Act are subject to the

---

[7] Petitioners note that while Respondents have identified this statute as the applicable statute of limitations before this Court and before the Panel, Respondents appear to have misstated applicable case law interpreting the application of this statute of limitations. The law of the Second Circuit clearly establishes that with regard to inquiry notice under the two-year prong of this statute of limitations, where a party placed on inquiry notice of a potential

statue of limitations set forth in § 22 of such Act, 7 U.S.C. § 25.  As specified in 7 U.S.C. §25(c), actions brought under the Commodity Exchange Act must commence no later than two years after the date the cause of action arises.[8]  Claims arising under the Utah Uniform Securities Act are subject to the statute of limitations set forth in such Act, Utah Code Ann. § 61-1-22(7)(a). Such section provides that actions brought to enforce liabilities under such Act must be brought no later than four years after the act or transaction constituting the violation, or two years after the discovery by the plaintiff of the facts constituting the violation, whichever comes first.

Respondents have not provided any evidence that the panel manifestly disregarded any of these applicable statutes of limitation.  Respondents have failed to demonstrate that the arbitrators knew of a governing legal principle, yet refused to apply it or ignored it altogether, and that the law ignored by the arbitrators was well-defined, explicit, and clearly applicable to the case.  Rather, with regard to each of these statute of limitation claims, Respondents attempt to re-argue questions of fact brought before, and decided by, the panel.  As was stated previously, such effort falls short of the requirement to demonstrate manifest disregard of the law.

---

fraud commences an inquiry into the underlying facts, the statute of limitations does not begin to run until the date on which the inquiring party, in the exercise of reasonable diligence, should have discovered the facts underlying the fraud.  See LC Capital Partners, LP v. Frontier Insurance Group, Inc. et al., 318 F.3d 148, 154 (2d Cir. 2003); Rothman v. Gregor, 220 F.3d 81, 96 (2d Cir. 2000).  See also In re Merrill Lynch & Co., Inc. Research Reports Securities Litigation, 289 F.Supp.2d 416, 424 (S.D.N.Y. 2003).

[8] Petitioners again note, however, that while Respondents have identified this statute as the applicable statute of limitations before this Court and before the Panel, Respondents appear to have misstated certain case law interpreting the application of this statute of limitations as well.  In the Second Circuit, the Commodity Exchange Act statute of limitations is interpreted as running when the aggrieved party is placed on inquiry notice of the underlying fraud, see Benfield v. Mocatta Metals Corp., 26 F.3d 19, 22 (2d Cir. 1994); as with the statute of limitations applicable to Respondents' federal securities law claims, however, this statute of limitations has been held not to run where the aggrieved party exercises reasonable care and diligence in seeking to learn the facts which would disclose fraud.  See Rotter v. Leahy, 93 F.Supp.2d 487, 500 (S.D.N.Y. 2000)(quoting Dodds v. Cigna Securities, Inc., 12 F.3d 346, 350 (2d. Cir. 1993)).  Petitioners note that this application of the Commodity Exchange Act statute of limitations is consistent with that applied by other federal circuits as well.  See Dyer v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 928 F.2d 238, 240 (7th Cir. 1991)("[T]he statute commences to run when the plaintiff, in the exercise of due diligence, has actual or constructive knowledge of the conduct in question.")(emphasis added); Maloley v. R.J. O'Brien & Associates, Inc., 819 F.2d 1435, 1439 (8th Cir. 1987).

The essential facts surrounding Respondents' fraud are set forth herein at pages 16 through 28. Based upon an email dated August 25, 2003, Respondents claim that the statute of limitations began to run on that date. Shah sent an email dated August 25, 2003 to Todd Brashear in which Shah falsely promised to send the McCarthey Investors the Schedule K-1s, but lied about the performance information set forth in the Schedule K-1s. The evidence in the record is that Shah never sent the Schedule K-1s. The 2002 Schedule K-1s were sent by the Fund's certified public accountant, RKC, and were attached to a cover letter dated August 27, 2003. Additionally, the schedules indicated a date and time of preparation of 6:20:55 pm on 8/27/03. Mr. Brashear stated in his sworn affidavit that he received the 2002 Schedule K-1s from RKC by U.S. Mail sometime after August 27, 2003. This statement was corroborated by John Zacharella, the RKC accountant who prepared the schedules, as he stated in his sworn affidavit that upon receipt of written instruction from Shah, Zacharella sent the 2002 Schedule K-1s to each general and limited partner of the Fund no earlier than August 27, 2003. **Bazil Affidavit, ¶42**. These facts established that the statute of limitations with regard to Petitioners' fraud claims could not have begun to run until sometime after August 27, 2003 at the absolute earliest.

As stated above, in this case, Respondents have merely recapitulated the erroneous factual arguments previously made to the Arbitration Panel and attempted to recast these assertions as a claim that the Panel ruled with manifest disregard for the law. In so doing, they have not provided this Court with any legally recognized basis for vacating the arbitration awards.

## CONCLUSION

For the foregoing reasons, Petitioners respectfully request that their Petitions to Confirm Arbitration Awards be granted.

Respectfully Submitted,


Anthony W. Djinis
Paul J. Bazil
Peter E. McLeod
Mark R. D'Arrigo
PICKARD AND DJINIS LLP
1990 M Street, N.W.
Suite 660
Washington, DC 20036
202 223 4418

Attorneys for Petitioners


Dated:  October 1, 2007

37

<u>CERTIFICATE OF SERVICE</u>

I, Anthony W. Djinis, hereby certify that on this 1st day of October 2007, I caused

a true and correct copy of the foregoing Petitioners' Reply Memorandum to be served by First

Class mail, Email and Electronic Filing upon counsel listed below.


Charles Manuel, Esq.
Shiboleth, Yisraeli, Roberts & Zisman, LLP
1 Penn Plaza
Suite 2527
New York, NY 10119

Counsel for Respondents



Anthony W. Djinis